UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CV-22482-ALTMAN/REID

**SARAH CATHERINE CAPROON**,

    *Plaintiff*,

v.

**KILOLO KIJAKAZI**,
*Acting Commissioner of Social Security Administration*,

    *Defendant*.
_____/

## ORDER

Our Plaintiff, Sarah Caproon, appeals the Defendant's denial of her application for Social Security benefits. *See* Compl. [ECF No. 1]. The parties filed cross-motions for summary judgment— *see* Plaintiff's Motion for Summary Judgment ("Pl.'s MSJ") [ECF No. 14]; Defendant's Combined Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment ("Def.'s MSJ") [ECF No. 16]—which we referred to United States Magistrate Judge Lisette M. Reid for a report and recommendation, *see* Order of Referral [ECF No. 13].

In her Report & Recommendation (the "R&R") [ECF No. 18], Magistrate Judge Reid recommended that we deny the Plaintiff's MSJ and grant the Defendant's MSJ. *See* R&R at 1. In response, the Plaintiff filed a set of objections, *see* Objections ("Obj.") [ECF No. 19]—all of which we now reject. After careful review, in short, we **ADOPT** the R&R, **DENY** the Plaintiff's MSJ, and **GRANT** the Defendant's MSJ.

1

## BACKGROUND[1]

On September 6, 2019, Caproon sought supplemental security income, claiming that she's been disabled since the day she was born (June 14, 1998). *See* ALJ Decision at 1 [ECF No. 12]. After her application was twice denied—first on January 24, 2020, and then again on May 4, 2020—Caproon appeared at a hearing before an Administrative Law Judge ("ALJ"). *Ibid.* The ALJ concluded that "the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act." *Id.* at 14. When the Social Security Administration's ("SSA") Appeals Council declined to reconsider the ALJ Decision, *see* R. at 9, Caproon appealed that decision to us, *see generally* Compl.

In her final decision, which we review here, the ALJ applied the SSA's five-step inquiry.[2] *See generally* ALJ Decision. At Steps One and Two, the ALJ determined that Caproon hasn't engaged in substantial gainful activity since September 6, 2019, and that she suffers from "severe impairments . . . [which] significantly limit the ability to perform basic work activities." *Id.* at 3. At Step Three, the ALJ found that these impairments don't "meet or equal the criteria of any listed impairment and no acceptable medical source designated to make equivalency findings has concluded that the [Plaintiff's]

---

[1] The following facts are taken from the certified administrative record. *See* Social Security Transcript ("R.") [ECF No. 12]. The ALJ Decision can be found at R. at 58–79. Since we cite it so often, though, we'll paginate it separately—*i.e.*, we'll refer to the first page of the ALJ Decision as ALJ Decision at 1, rather than R. at 58.

[2] That inquiry helps the ALJ determine whether a claimant is disabled by reference to the following five questions:

> (1) [W]hether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functioning capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citing 20 C.F.R. § 404.1520(a)(4)(i)–(v); and then 20 C.F.R. § 416.920(a)(4)(i)–(v)).

impairments medically equal a listed impairment." *Id.* at 4. In arriving at this conclusion, the ALJ considered *both* Caproon's physical *and* mental impairments, *id.* at 4–6, and determined that, despite these impairments, she can still perform the basic functions of daily living, *id.* at 5. Specifically, the ALJ noted:

> The [Plaintiff] reported in her Function Report that she was able to dress herself, shave, bathe herself, care for her own hair and shave with no problem. She reported being able to do household chores and prepare meals for herself. She was able to ride in a car, use public transportation and shop in stores for food and clothes. She was also able to pay her bills, count change, and handle a savings account.

*Id.* at 5 (cleaned up). In other words, the ALJ concluded that "the evidence of record supports the fact that she functions quite independently." *Id.* at 6.

At Step Four, the ALJ determined that Caproon "has the residual functional capacity to perform sedentary work[.]" *Id.* at 7; *see also ibid.* (finding that "the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with medical evidence and other evidence in the record"). The ALJ based this conclusion on a thorough review of Caproon's medical history—both physical and mental. *Id.* at 6–12.

With respect to Caproon's physical impairments, the ALJ found, among other things, that: (1) "her physical impairments, while limiting, are not disabling within the meaning of the regulations," *id.* at 9; (2) "[s]he endorsed occasional palpitations that mostly occurred at night, however, they only occurred a few times per month and were self-limiting[,]" *ibid.*; and (3) "[t]he medical evidence of record indicates the [Plaintiff] received routine treatment for her impairments, which generally responded to treatment," *id.* at 10.

The ALJ similarly found that Caproon's "disabling mental impairments" didn't preclude her from participating in the workforce. *Id.* at 7. Here, the ALJ acknowledged that Caproon suffers from major depressive, bipolar, eating, and learning disorders. *See id.* at 7–8. But she concluded that "the

3

claimant's medical history is inconsistent with her allegations of disabling mental impairments." *Id.* at 7. In saying so, the ALJ noted the progress Caproon had shown—and the increased functionality she had exhibited—throughout her psychological treatment (between 2018 and 2019). *Id.* at 7–9. The ALJ explained that, in the various notes she reviewed from *different* mental-health professionals during this period, Caproon described herself as "fairly well despite her struggles" and reported that she was excelling in her college courses (with a 3.8 GPA, according to the notes of her psychiatrist, Dr. Tobolowsky). *Id.* at 10. And Caproon's providers noticed this improvement too. For example, the ALJ cited one psychological-caregiver, Dr. Garrard, who wrote that Caproon "has been trying to use effective coping skills and feels that she has been managing well." *Ibid.* Dr. Tobolowsky, too, indicated "that [Caproon] was subjectively better" and "seems calmer," and he recorded Caproon's claim that she was "feeling 'OK' and felt 'more even'" on her new medication. *Id.* at 9.

Still in Step Four, the ALJ considered the opinions of the SSA's medical experts. *Id.* at 10–12. Here, she concluded:

> [T]he opinions of State agency psychological consultants Frances Martinez, Ph.D. and Pamela D Green, Ph.D. are persuasive. They opined that the claimant was "not disabled," and had mild and moderate functional limitations. The undersigned finds that their opinions are persuasive, as they are consistent with the claimant's medical records . . . [and] finds the opinions of State agency medical consultants David Guttman, M.D. and Kathy O'Shea, M.D. are persuasive. They opined that the claimant was "not disabled," and could work at the sedentary exertional level. The undersigned finds that their opinions are persuasive, as they are consistent with the claimant's medical records.

*Id.* at 10 (cleaned up). By contrast, the ALJ found "the opinion of Todd Roth, M.D."—Caproon's treating physician—"not persuasive" because "his opinion is not entirely consistent with or supported by the clinical notes from this source, or other substantial evidence of record." *Id.* at 11. Specifically, the ALJ believed that Caproon's medical records contradicted Dr. Roth's "opin[ion] that the [Plaintiff] could [only] perform less than sedentary exertion," that she could only "work at the sedentary

4

exertional level," and that she "would miss four or more days of work, and would be off task 25% or more of the workday." *Ibid.* The ALJ then explained why she felt this way. In her words:

> In March 2020, the claimant was treated at Memorial Hospital for a follow-up examination for her history of Noonan Syndrome and hypertrophic cardiomyopathy. Her treatment notes indicate that the claimant had been on beta-blocker therapy for at least five years, which "seems to help with her palpitations and has stabilized her left ventricular outflow tract obstruction." Her treatment notes further indicate that, "Since her last visit, there have not been any significant events." Additionally, the claimant's August 2019 physical examination reflects that she had a regular heart rate and rhythm. The claimant had no musculoskeletal symptoms with a normal tone, and no significant weakness. Her gait was also normal. The claimant was awake, alert and not in acute distress. She also had good exercise tolerance and reported a mile after a period of inactivity, and felt "ok."

*Ibid.* (cleaned up).

The ALJ also delved into the opinions of three *other* doctors: Linda Keller, Parul Jayakar, and David Tobolowsky—all treating physicians who submitted written opinions on Caproon's behalf. *Id.* at 11–12. Starting with Dr. Keller, the ALJ found that her "opinion is partially persuasive as to the diagnoses and treatment, to the extent that diagnoses and treatment are opinion evidence within the meaning of the regulations[.]" *Id.* at 11. But, the ALJ added, "[Dr. Keller] did not quantify the functional limitations as contemplated for opinion evidence by the regulations"—and, as a result, "the opinion's persuasive value could not be evaluated." *Ibid.* The ALJ said something similar about Dr. Jayakar, who "did not provide function-by-function assessment as contemplated by the regulations for opinion evidence, and to that extent, persuasive value cannot be assessed." *Id.* at 12. And the same was true of Dr. Tobolowsky—who recommended that "the [Plaintiff] not have full course load"— because "the doctor did not provide either a diagnosis or specific functional limitations." *Ibid.*

At Step Five, the ALJ concluded as follows: "Based on the testimony of the vocational expert, . . . the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate under the framework of the

5

above-cited rule." *Id.* at 13. According to the ALJ, then, "[t]he claimant has not been under a disability, as defined in the Social Security Act, since September 6, 2019, the date the application was filed (20 CFR 416.920(g))." *Id.* at 14.

### STANDARD OF REVIEW

Our review of an ALJ's decision is "limited to an inquiry into whether there is substantial evidence to support the findings of the [ALJ], and whether the correct legal standards were applied." *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This determination—whether the ALJ applied the correct legal standard—is a legal one subject to *de novo* review. *Graham v. Bowen*, 90 F.2d 1572, 1575 (11th Cir. 1986) (citation omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Lewis v. Callahan*, 12 F.3d 1436, 1439 (11th Cir. 1997). The Court may not, however, "reweigh the evidence, or substitute [its] judgment" for the ALJ's—even if the "evidence preponderates against the [ALJ's] decision." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citation omitted).

When a party objects to a report and recommendation, "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." FED. R. CIV. P. 72(b)(3). "A general objection, or one that merely restates the arguments previously presented[,] is not sufficient to alert the court to alleged errors on the part of the magistrate judge. An objection that does *nothing more than state a disagreement* with a magistrate's suggested resolution, or *simply summarizes what has been presented before*, is not an 'objection' as that term is used in this context." *VanDiver v. Martin*, 304 F. Supp. 2d 934, 937–38 (E.D. Mich. 2004) (emphasis in original); *cf. Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate [judge]'s factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings."). "Objections to a magistrate judge's recommendation and report must be specific

and clear enough to permit the district court to effectively review the magistrate judge's ruling." *Knezevich v. Ptomey*, 761 F. App'x 904, 906 (11th Cir. 2019) (cleaned up).

## THE R&R

In her MSJ, Caproon argued that, "[w]hen the medical evidence is looked at in its entirety, along with the testimony of the Plaintiff, there is sufficient evidence to establish that the Plaintiff suffers from severe impairments." Pl.'s MSJ at 5–6. As we've said, Magistrate Judge Reid found this argument unpersuasive and, moving along two fronts, recommended that Caproon's MSJ be denied. *See* R&R at 3 ("Plaintiff contends that: (1) substantial evidence does not support the ALJ's unfavorable decision because the ALJ did not properly evaluate the various medical opinions and records; and (2) the ALJ did not adequately evaluate Plaintiff's subjective complaints.").

*First*, Magistrate Judge Reid determined that "the ALJ's decision is supported by substantial evidence[.]" R&R at 12. In saying so, she noted that the ALJ's review of Caproon's medical history was comprehensive and consistent with the record evidence. *Ibid.* ("Specifically, the ALJ determined Plaintiff's heart disease, as well as her mental impairments, do not prevent Plaintiff from engaging in activities of daily living, rather 'the evidence of record supports the fact that she functions quite independently.' There is substantial evidence in the record to support this conclusion.").

*Second*, she found Caproon's "contention that the ALJ failed to give sufficient weight and consideration to her subjective complaints [ ] without merit[.]" *Id.* at 15. According to the Magistrate Judge, Caproon had failed the Eleventh Circuit's "three-part standard [that applies] when a claimant seeks to establish disability through [her] own testimony regarding pain or other subjective symptoms[.]" *Ibid.* (citing *Conner v. Astrue*, 415 F. App'x 992, 995 (11th Cir. 2011)). And, although "the ALJ acknowledged that Plaintiff has underlying medical conditions. . . . [she] concluded that the objective medical evidence did not confirm the severity of Plaintiff's alleged disabling pain, or that the objective evidence was such that it is reasonably expected to give rise to the alleged pain." *Id.* at 16.

7

The ALJ arrived at this conclusion—Magistrate Judge Reid wrote—only after "compar[ing] and contrast[ing] various medical records, physician opinions, Plaintiff's hearing testimony, and other record evidence such as Plaintiff's academic record." *Ibid.*

### CAPROON'S OBJECTIONS

Although Caproon now objects to the R&R, her Objections (for the most part) fail even to mention the R&R—let alone identify the specific errors she's challenging. *See generally* Obj. The Objections are also plagued by a separate issue: Although they come in 13 numbered paragraphs, when read carefully, they seem to launch only three formal Objections. The first of these reads: "The Objection to the Report and Recommendation and the Findings by the SSA is the disregard for the testimony and evidence of the people who know the Plaintiff, in person." Obj. ¶ 2. This First Objection is mostly premised on Caproon's view that "the paper record is inadequate." *Id.* ¶ 3. She says, for instance, that "the paper record does not reveal the fact that the Plaintiff sleeps some days, all day, because of her conditions and her medications," *id.* ¶ 4; that "the paper record does not reveal the amount of times each month the Plaintiff seeks out medical treatment or is required to go to the doctor," *id.* ¶ 5; and that the paper record doesn't show "the amount of support her family provides to the Plaintiff for her daily living skills and ability to function in the world, every day and on an on going [sic] basis," *id.* ¶ 6. And these apparent omissions from the "paper record" matter (Caproon insists) because, "[w]hen the Court looks only at the paper record, the paper reveals a young woman attending college part time." *Id.* ¶ 1. "The paper also reveals," Caproon continues, "a clear history of medical and mental health issues—these medical and mental health issues are not in dispute, The paper record reveals a young woman who is managing to overcome these issues, on paper." *Ibid.* (errors in original). "The paper record reveals," Caproon adds, "medical professionals who do not want to give up on this young person and continue to, on paper, and want to keep hope and optimism in the conversation because the Plaintiff, in this case, is so young." *Ibid.* (errors in original). In other

8

words, Caproon tells us, "[w]hen a person is as young as the Plaintiff, the paper record does not always reflect the true deficits of that young person, because no one wants to give up on that young person, too quickly." *Id.* ¶ 7 (errors in original).[3]

Instead of relying on the paper record, then, Caproon argues that "[m]ore weight should have been given to the people who know and interact with the Plaintiff on a daily and monthly basis, rather than those who have never met her and only formed their opinions based upon the paper record." *Id.* ¶ 10. In support of this Second Objection, Caproon says that, contra what the paper record reveals, "[w]hen the treating physicians were . . . asked the direct question about working, they all stated, that the reality is, this young person cannot maintain or sustain employment." *Id.* ¶ 8.[4]

---

[3] We may be wrong that paragraphs 2–7 are intended as support for the Objection in paragraph 1. It may be, in other words, that Caproon intended these seven paragraphs as separate, standalone objections. If that's the case, though, we overrule all of them because Caproon never challenged the adequacy of the paper record in her MSJ, *see generally* MSJ, and "a district court has the discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge." *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009) (citing *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990–91 (1st Cir. 1988) (holding "categorically that an unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate")). And this rule makes sense: "[T]he magistrate judge system was created to help alleviate the workload of the district judges," and "it would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate, wait to see which way the wind was blowing, and—having received an unfavorable recommendation—shift gears before the district judge." *Id.* at 1291–92 (cleaned up).

[4] Paragraph 9 follows with a single sentence: "These are not inconsistent statements." Obj. ¶ 9. Although we'd be justified in rejecting this Objection (if it is a separate objection) out of hand—*see Knezevich*, 761 F. App'x at 906 ("Furthermore, objections to a magistrate judge's recommendation and report must be specific and clear enough to permit the district court to effectively review the magistrate judge's ruling." (cleaned up))—we'll take a moment to consider what Caproon is trying to say here. She seems to recognize, on the one hand, that her doctors' notes paint a picture of a patient who was getting better with treatment, Obj. ¶ 1, and who had retained some level of functionality, *id.* ¶ 6. On the other hand, she wants us to understand that, theoretically, a doctor *could* believe that his patient *cannot* work, even though his notes suggest she retains *some* functionality. And that's really what this paragraph is doing—insisting that the ALJ (and the Magistrate Judge) were wrong to find some incongruity between her doctors' opinions and their observations. Viewed this way, though, the paragraph doesn't really add anything to the three merits Objections we're already addressing—and rejecting—in this Order: *viz.*, that the "paper record" doesn't tell the whole story, *see* Obj. ¶¶ 2–7; that more weight should have been given to the views of her personal doctors, *see id.* ¶ 10; and that the Magistrate Judge (and the ALJ) ignored the testimony of the vocational expert (Mr. Barrett), *see id.* ¶¶ 11–13. In any event, as we explain below (*see infra* pp. 12–17), the record evidence *supports* the ALJ's

In her Third Objection, Caproon contends that "the Court, when making its determination, ignored the Agency's own Vocational Expert Jeffery Barrett [who] testified that there were three sedentary work type jobs available in the national economy. . . . [O]n paper, these jobs might exist in the national economy, but in reality, these jobs do not exist in the Plaintiff's locality. . . . These are not in reality, or actuality available to the Plaintiff." *Id.* ¶ 11 (errors in original). Here, Caproon points to Mr. Barrett's testimony that "the Plaintiff would not be employable if she (1) could not be around the public or her coworkers; or (2) was off task 25% of the day; or (3) missed work 3 to 4 times a month as that would be excessive and 'would be preclusive of any employment.'" *Id.* ¶ 12 (quoting R. at 109). "These realities of excessive medical appointments, fatigue and sleeping and inability to be in public," Caproon continues, "were not disputed by the Agency and are supported by the record evidence along with the testimony of the witnesses." *Id.* ¶ 13. When Mr. Barrett's views are properly considered, Caproon concludes, "the Agency did not meet its burden to show that the Plaintiff can perform any work." *Id.* at 3.

### ANALYSIS

Before we tackle Caproon's Objections, we'll say a word about her conclusion. In summarizing (what we've construed as) her three Objections, Caproon claims that, "when more than just the paper record is looked at, there is sufficient and compelling evidence to find that the Plaintiff is unable to maintain employment because of her disabling conditions and when looked at in its totality, benefits should have been awarded." *Ibid.* We don't see this as a separate objection for two reasons. *First*, whereas the rest of her assertions come in numbered paragraphs, this one appears in a standalone sentence—unaccompanied by a paragraph number—at the end of her Objections. It thus reads as a kind of conclusion or summation of what Caproon hopes her Objections will achieve.[5]

---

treatment of Caproon's experts. And it's not our place to reweigh that evidence or to second-guess the ALJ's credibility determinations. *See Bloodsworth*, 703 F.2d at 1239.

[5] The Objections read very much as if they were filed *pro se*—but they weren't.

*Second*, if Caproon *did* intend to offer this final sentence as a separate objection, we'd overrule it as improper. We don't, after all, consider "conclus[ory] objection[s]" that simply "renew[ ] all of the arguments raised in Plaintiff's brief[.]" *Buffington*, 2012 WL 3715107, at *1. Caproon's blanket plea for us to reassess her benefits denial, therefore, isn't "specific and clear enough to permit the district court to effectively review the magistrate judge's ruling." *Knezevich*, 761 F. App'x at 906. Were the rule otherwise, any litigant could circumvent the magistrate-judge referral (and get two bites at the apple) by simply asking the district judge, once the magistrate judge has ruled against him, to reevaluate the whole case. As we've said, "the magistrate judge system was created to help alleviate the workload of the district judges[.]" *Williams*, 557 F.3d at 1291–92; *see also, e.g., United States v. Benton*, 523 F.3d 424, 429 (4th Cir. 2008) ("The Magistrates Act . . . was passed by Congress to ease the rapidly increasing and overwhelming caseload burden of many district courts[.]" (cleaned up)). So, again, we construe this final sentence as a summation of the relief Caproon hopes her Objections will provide. With this framework in mind, we turn to the three Objections.

### **The First Objection**

In her First Objection, Caproon says that "[t]he Objection to the Report and Recommendation and the Findings by the SSA is the disregard for the testimony and evidence of the people who know the Plaintiff, in person." Obj. ¶ 2. Right off the bat, this Objection is inadequate: It doesn't identify the "testimony and evidence" the Magistrate Judge (or the ALJ) disregarded, and it doesn't tell us *who* "know[s] the Plaintiff in person." That's reason enough for us to overrule this Objection. *See United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009) ("It is reasonable to place upon the parties the duty to pinpoint those portions of the magistrate's report that the district court must specially consider. This rule facilitates the opportunity for district judges to spend more time on matters actually contested and produces a result compatible with the purposes of the Magistrates Act."); *see also Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Courts

11

are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material.").

Still, we'll give Caproon the benefit of the doubt and assess the merits of this Objection anyway.[6] But how do we figure out what she's talking about here? Well, when we combine the central thrust of this First Objection—"the people who know the Plaintiff"—with Caproon's MSJ, we get *some* clue about what she *might* mean here. In her MSJ, Caproon argued that "[t]he ALJ improperly dismissed most of [Dr. Roth's] findings and opinions as either not persuasive or because the persuasive value could not be assessed." Pl.'s MSJ at 3. Dr. Roth, remember, is Caproon's treating physician— and, as a result, knows her better than the SSA's experts do. We assume, then, that Caproon is, through this First Objection, suggesting that the ALJ ignored the testimony of Dr. Roth.[7]

---

[6] We needn't have done this, of course. *See, e.g.*, *Patrick v. Warden*, 828 F. App'x 518, 522 (11th Cir. 2020) (noting that even the delicate task of liberally construing *pro se* habeas petitions "does not mean we are required to construct a party's legal arguments for him" (cleaned up)).

[7] We don't think Caproon is referring to anyone else, since she only mentioned Dr. Roth in her MSJ. *See generally* Pl.'s MSJ. But *if* Caproon *did* intend this Objection to apply equally to Drs. Keller, Jayakar, and Tobolowsky, we'd overrule it anyway because, as we've seen, the ALJ didn't "disregard" these doctors' testimony. Far from it: The ALJ specifically considered these doctors' views and found them unpersuasive—mostly because none of them conducted a functionality assessment. *See supra* p. 5; *see also* ALJ Decision at 11–12.

We could also imagine Caproon suggesting that she intended this Objection to encompass her *own* testimony, since she did argue in her MSJ that "the ALJ ignore[d] the Plaintiff's testimony." Pl.'s MSJ at 4. Again, she never says this in her Objections—which is reason enough to stop here. But, even if she had raised this objection, we would've overruled it. The ALJ expressly considered Caproon's "statements about the intensity, persistence, and limiting effects of her symptoms," ALJ Decision at 10, but found that "they are not entirely consistent with or supported by the substantial evidence of record," *ibid*. In support of this determination, the ALJ compared Caproon's testimony to the medical records reflecting "that she had a regular heart rate and rhythm . . . a quiet precordium, and normal S1 and S2, with no S3 or S4 gallop . . . no musculoskeletal symptoms . . . and no significant weakness[, and] she was awake, alert, and not in acute distress." *Id.* at 10. We agree, then, with the Magistrate Judge that the "Plaintiff's contention that the ALJ failed to give sufficient weight and consideration to her subjective complaints is without merit," R&R at 15, because "the ALJ's conclusion that Plaintiff's subjective complaints 'are not entirely consistent with or supported by the evidence of record' is supported by substantial evidence," *ibid*.

12

But that's simply not true. In fact, after laying out Dr. Roth's position, *see* ALJ Decision at 11—the one Caproon now says the ALJ disregarded—the ALJ proceeded to explain, in a long paragraph, precisely why she found Dr. Roth's opinion unpersuasive:

> [Dr. Roth] opined that the claimant could perform less than sedentary exertion, work at the sedentary exertional level, *would miss four or more days of work*, and would be off task 25% or more of the workday. *The opinion is not entirely consistent with or supported by the clinical notes from this source, or other substantial evidence of record*. For example, in March 2020, the claimant was treated at Memorial Hospital for a follow-up examination for her history of Noonan Syndrome and hypertrophic cardiomyopathy. Her treatment notes indicate that the claimant had been on beta-blocker therapy for at least five years, which "seems to help with her palpitations and has stabilized her left ventricular outflow tract obstruction." Her treatment notes further indicate that, "Since her last visit, there have not been any significant events." Additionally, the claimant's August 2019 physical examination reflects that she had a regular heart rate and rhythm. The claimant had no musculoskeletal symptoms with a normal tone, and no significant weakness. Her gait was also normal. The claimant was awake, alert and not in acute distress. She also had good exercise tolerance and reported a mile after a period of inactivity, and felt "ok."

*Ibid.* (cleaned up and emphasis added).

Nor is Caproon right to say that the Magistrate Judge "disregard[ed]" Dr. Roth. Again, Magistrate Judge Reid discussed Dr. Roth's Physical Medical Source Statement, which reported that the Plaintiff would "be 'off task' 25% or more during a typical workday, and on average would be absent from work more than four days in a month," and which claimed that the "Plaintiff is incapable of tolerating even 'low stress' work, because 'stress may cause [a] cardiac event.'" R&R at 3. The Magistrate Judge nevertheless determined that "the ALJ's conclusion that Dr. Roth's opinion was unpersuasive is supported by substantial evidence." *Id.* at 14. And the Magistrate Judge explained exactly why she felt this way:

> The ALJ concluded, based on her review of the record, that Dr. Roth's opinion was inconsistent with the record evidence. *See, e.g.*, [ECF No. 12 at 68] (noting Dr. Roth's opinion that Plaintiff could not even perform sedentary work was inconsistent with other record evidence indicating Plaintiff was responding well to her medication and had "good exercise tolerance and reported a mile after a period of inactivity, and felt 'ok'"). As the ALJ's analysis of Dr. Roth's opinion, and the weight assigned to it, is supported by substantial record evidence, it is not for this Court to reweigh the evidence. This is true despite the fact Dr. Roth is Plaintiff's treating physician. *See* 20

13

>C.F.R. § 416.920c(a) (2017) (noting the agency chose not to retain the "treating source rule" and instead the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including those from [a claimant's own] medical sources.").

*Ibid* (cleaned up). Caproon may disagree with this conclusion. But that doesn't mean the ALJ (or the Magistrate Judge) "disregard[ed]" this evidence. And we aren't free to "decide the facts anew, reweigh the evidence, or substitute our judgment" for the ALJ's. *Bloodsworth*, 703 F.2d at 1239. The First Objection is **OVERRULED**.

### The Second Objection

In her Second Objection, Caproon contends that "more weight should have been given to the people who know and interact with the Plaintiff on a daily and monthly basis, rather than those who never met her and only formed their opinions based upon the paper record." Obj. ¶ 10. Four major problems here: *One*, again, Caproon doesn't tell us *whose* opinions should have received more weight. *Two*, Caproon doesn't identify the evidence that (she believes) should've received *lesser* weight. *Three*, Caproon doesn't direct this objection at the Magistrate Judge at all—so we have no idea whether she's here objecting to the R&R or the ALJ Decision.[8] *Four*, even if we were to ignore all of these deficiencies, the Second Objection fails.

To get to this fourth problem, though, we have to make some assumptions about what Caproon is actually saying here.[9] We make these assumptions (again) by referencing what she said on this topic in her MSJ. There, for instance, she had insisted that "the ALJ and Appeals Council improperly selected certain medical information while ignoring information provided by the Plaintiff's treating physicians." Def.'s MSJ at 5. She also claimed that, "had the ALJ considered the evidence the combined effect of all the Plaintiff's deficits would have risen to the level of impairments that met or

---

[8] Of course, if she's objecting to the ALJ Decision, this Second Objection would be improper. *See, e.g.*, *Holland*, 2015 WL 1245189, at *3 ("A party objecting to an R&R may not simply restate the arguments previously presented.").

[9] We stress again that, hard as it may be to believe, the Objections were filed by a practicing lawyer.

14

equaled the SSA listing of impairments. Instead the ALJ relied heavily on assessments by non-examining physicians." *Id.* at 6. From these snippets, we glean the following: that, in her First Objection, Caproon was complaining that the Magistrate Judge (and the ALJ) *ignored* Dr. Roth's opinions, whereas in this Second Objection she's saying that, even if Dr. Roth wasn't *ignored*, the Magistrate Judge (and the ALJ) should've *weighed* his opinions—and the opinions of *other* people who know the Plaintiff—more heavily than the opinions of people who don't know her (*i.e.*, the SSA doctors). Why should people who know her get more weight than people who don't? Well, Caproon says, because they know her.

But, under § 416.920c(a), the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including those from [a claimant's own] medical sources." The law thus no longer allows ALJs to weigh *more favorably* the opinions of people who know the plaintiff. *See Belser v. Soc. Sec. Admin., Comm'r*, 2021 WL 6116639, at *5 (11th Cir. 2021) ("For claims filed on or after March 27, 2017, the agency does not defer to or give specific evidentiary weight to any medical opinion."). That's really the end of the Second Objection.

In any event, we agree with the Magistrate Judge that the record amply supports the ALJ's weighing of the evidence. *See* R&R at 14 ("As the ALJ's analysis of Dr. Roth's opinion, and the weight assigned to it, is supported by substantial record evidence, it is not for this Court to reweigh the evidence. This is true despite the fact that Dr. Roth is Plaintiff's treating physician."). As the Magistrate Judge explained, the ALJ gave considerable weight to the opinions of four experts: Drs. Green, Martinez, O'Shea, and Guttman. *Ibid.* Drs. Green and Martinez "opined that the claimant was 'not disabled,' and had mild and moderate functional limitations." ALJ Decision at 10. The ALJ found these "opinions [ ] persuasive, as they are consistent with the claimant's medical records," *ibid.* And

15

she did a good job of explaining why she felt this way (by reference to the notes of Dr. Tobolowsky, one of Caproon's treating physicians):

> For example, the claimant's treatment notes from psychiatrist David Tobolowsky, M.D. indicate that she was a student at Miami-Dade College, anticipating completing an associate's degree in sociology next spring. Her GPA was 3.8 and she wanted to transfer to FIU and major in sociology and minor in criminology. The claimant reported that she liked to write and draw, and volunteered at her school, and read. Her socialization is mainly at school and the disability center. Her mental status examination showed that she made good eye contact and had good hygiene and grooming. The claimant's thought processes were logical and coherent, and she had good awareness of current events. Her insight and judgement were intact. Additionally, the claimant reported at her January 2019 psychology treatment that she had been doing "fairly well despite her struggles." She had been trying to use effective coping skills and felt that she had been managing well.

*Ibid.* (cleaned up).

Drs. O'Shea and Guttman likewise "opined that the claimant was 'not disabled,' and could work at the sedentary exertional level." *Ibid.* Again, the ALJ found "that their opinions are persuasive, as they are consistent with the claimant's medical records." *Ibid.* To support this finding, the ALJ reviewed the records of Dr. Andrew Schell, an ENT who had seen Caproon in 2019–20. As the ALJ pointed out, Dr. Schell's observations fully support the opinions of Drs. O'Shea and Guttman:

> For example, in February 2020, the claimant had a follow-up examination for nasal congestion with Andrew Schell, M.D. at South Florida ENT Associates. She appeared healthy and not in acute distress, and had a normal mood and affect. Apart from sinusitis, the claimant had an overall normal physical examination with no cardiology symptoms. Additionally, the claimant's August 2019 physical examination reflects that she had a regular heart rate and rhythm. She had a quiet precordium, and normal S1 and S2, with no S3 or S4 gallop. The claimant had no musculoskeletal symptoms with a normal tone, and no significant weakness. Her gait was also normal. The claimant was awake, alert and not in acute distress.

*Id.* at 10–11 (cleaned up).

The ALJ, in short, reviewed the opinions of the SSA's medical experts, compared those opinions to the record evidence (much of it from Caproon's own words or from her treating physicians' notes), and concluded that those opinions were reasonable and well supported. That's precisely how an ALJ should be reviewing these cases.

The ALJ then gave less weight to the opinions of Drs. Keller, Jayakar, and Tobolowsky. *See* ALJ Decision at 11. And for good reason: As the ALJ explained, Dr. Keller's view was only "partially persuasive as to the diagnoses and treatment, to the extent that diagnoses and treatment are opinion evidence within the meaning of the regulations," because "[Dr. Keller] did not quantify the functional limitations as contemplated for opinion evidence by the regulations." *Ibid.* So too with Dr. Jayakar, who "did not provide function-by-function assessment as contemplated by the regulations for opinion evidence, and to that extent, persuasive value cannot be assessed." *Id.* at 12. And the same was true of Dr. Tobolowky, who likewise "did not provide either a diagnosis or specific functional limitations." *Ibid.* The Magistrate Judge summarized the ALJ's position on these three doctors nicely: "The ALJ," Judge Reid wrote, "put forth similarly sufficient rationale in concluding the opinions of Dr. Keller, Dr. Parul Jayakar, and Dr. Tobolowsky were only partially persuasive because each failed to quantify Plaintiff's functional limitations, and were at least partially inconsistent with one another." R&R at 14–15.

That seems reasonable enough. How *can* these doctors tell us that Caproon cannot work without first determining the extent of her functional limitations? The ALJ reasonably concluded that these experts really can't do that, Magistrate Judge Reid agreed with her, and it's not our role to second-guess those judgments. *See Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) ("We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner. . . . If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." (cleaned up)); *see also Winschel,* 631 F.3d at 1178 ("In Social Security appeals, we must determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to

17

support a conclusion . . . . We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner]." (cleaned up)).

We are, in short, persuaded that substantial record evidence supports the ALJ's decision. The Second Objection is thus **OVERRULED**.

### The Third Objection

In her Third Objection, Caproon maintains that "the Court, when making its determination, ignored the Agency's own Vocational Expert Jeffery Barrett." Obj. ¶ 11; *see also id.* ¶ 12. She made a similar argument in her MSJ, where she claimed that "the ALJ also ignores the testimony of the independent vocational expert [Barrett] who testified at the hearing. The expert testified that if the Plaintiff were off task at least 25% of the time, there would be no jobs for her." Pl.'s MSJ at 4. This Third Objection is frivolous.

In the R&R, the Magistrate Judge spent almost an entire page recounting Mr. Barrett's testimony, R&R at 9, addressing (and rejecting) many of the same details Caproon now says the R&R "ignored," Obj. ¶¶ 11, 12. Here's what the R&R had to say about Mr. Barrett's testimony:

> When asked by Plaintiff's counsel "if a hypothetical claimant would be unable to be around the public" or coworkers would they be able to do the jobs Mr. Barrett designated, Mr. Barrett acknowledged such a special accommodation would not be something an ordinary employer would do. Similarly, regarding a hypothetical claimant who "would be off-task at least 25 percent of their day," Mr. Barrett asserted an employer would find that to be "excessive" and "would be preclusive of any employment." Mr. Barrett opined the same would be true of a claimant who would routinely miss at least three to four days of work per month, or one who could not type consistently.

R&R at 9 (cleaned up). The Magistrate Judge found that Mr. Barrett's testimony *didn't* support Caproon's side of the story—in large part because Mr. Barrett "concluded there were jobs in the national economy Plaintiff would be able to engage in. These included 'microfilming;' 'addresser;' and 'cutter and paster.'" *Id.* at 9. "All these occupations," the Magistrate Judge noted, "involve sedentary

18

work and are within 'Plaintiff's reasoning level.'" *Ibid.* Caproon may disagree with this conclusion—but she cannot fairly say that the R&R "ignored" Mr. Barrett.

And, for what it's worth, the ALJ didn't ignore Mr. Barrett either: She specifically "asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." ALJ Decision at 13. "The vocational expert testified that given all of these factors the [Plaintiff] would be able to perform the requirements of representative occupations such as [document preparer, addresser, or cutter and paster]." *Ibid.* The ALJ determined "that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." *Ibid.* And, the ALJ added, "based on the testimony of the vocational expert[,] . . . the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Ibid.* Far from ignoring the testimony of Mr. Barrett, then, the ALJ pointed out that Mr. Barrett supported the SSA's (rather than Caproon's) position.

The Third Objection is **OVERRULED**.

\* \* \*

Because the R&R hasn't left us "with a definite and firm conviction that a mistake has been committed," *Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1523 (11th Cir. 1997), Caproon's Objections are **OVERRULED**. We thus **ORDER AND ADJUDGE** as follows:

1. The Report and Recommendation [ECF No. 18] is **ACCEPTED and ADOPTED**.
2. The Plaintiff's Motion for Summary Judgment [ECF No. 14] is **DENIED**.
3. The Defendant's Motion for Summary Judgment [ECF No. 16] is **GRANTED**.
4. Pursuant to Federal Rule of Civil Procedure 58, final judgment will be entered separately.

5. The Clerk of Court shall **CLOSE** this case. All other pending motions are **DENIED as moot**. And all other deadlines are **TERMINATED**.

**DONE AND ORDERED** in Miami, Florida, this 29th day of August 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record